# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

Ricardo Nieves,                                    :
                                                   :
                        Plaintiff,                 :
                                                   :
            vs.                                    :
                                                   :
City of Reading, Pennsylvania,                     :     Civil Action No. _____
Vaughn Spencer, in his Official Capacity as        :
Mayor of the City of Reading and in his            :
Individual Capacity,                               :     **JURY TRIAL DEMANDED**
William Heim, in his Official Capacity as          :
Chief of the Reading Police Department             :
And in his Individual Capacity,                    :
Pacific Institute for Research & Evaluation,       :
John Doe, an Adult Individual, and                 :
Jane Doe, an Adult Individual,                     :
                                                   :
                        Defendants.                :

## Brief in Support of Motion for Preliminary Injunction

Plaintiff Ricardo Nieves by undersigned counsel files the within brief in support of his

motion for preliminary injunction.

**I.      Factual Background**

Plaintiff is a resident of the City of Reading, which is a political subdivision of the

Commonwealth of Pennsylvania and is physically situate in Berks County.  Comp. ¶¶ 1, 2.

Defendant Vaughn Spencer is the Mayor of the City of Reading, the highest elected

administrative official in the city.  In such capacity Vaughn serves as the highest government

official who oversees the operations of the Reading Police Department ("Department") and sets

policy for the Department.  Comp. ¶ 3.  Defendant William Heim is the chief of the Reading

Police Department, and in such capacity serves as the overseer of day-to-day operations of the

Department.  Comp. ¶ 4.  The Pacific Institute for Research and Evaluation ("PIRE") is a private corporation.  Comp. ¶ 5.

On Friday, December 13, 2013, Nieves was traveling on the Bingham Street Bridge into the City of Reading, Pennsylvania, a public roadway.  Decl. ¶ 2.  A cruiser owned and operated by the City of Reading Police Department was parked by the side of the street with its lights flashing.  Decl. ¶ 3.  Bright orange security cones lined the lane where plaintiff was driving.  Plaintiff was in the right hand lane and the lane to plaintiff's left was full of traffic such that Nieves could not pull over to change lanes.  Decl. ¶ 4.

An adult male (Defendant "John Doe") stepped out into plaintiff's lane of traffic, blocked his further advance, and flagged him to pull off the public road into a parking lot on Laurel Street.  Decl. ¶ 5.  Having no ability to advance further on the road, and with no ability to move into the left-hand lane because of traffic, plaintiff drove into the parking lot.  Decl. ¶ 6.  In the parking lot were five to seven improvised parking spaces outlined on three sides with orange security cones.  Decl. ¶ 7.  Nieves pulled into one of these security coned spaces.  *Id.*

Nieves reasonably believed under the totality of the circumstances that he was being stopped by the Reading Police Department because of the flashing lights of the police car on the street, the fluorescent orange cones on the street and in the parking lot, and the presence of a police car in the parking lot that was occupied by a police officer.  Decl. ¶ 8.

A woman with a clipboard (Defendant "Jane Doe") approached plaintiff's car and began to speak to him.  Decl. ¶ 9.  Jane Doe spoke quickly and said several things, including that plaintiff was not being cited, that plaintiff had done nothing wrong and that plaintiff was not being "pulled over."  Decl. ¶ 10.

The last statement that plaintiff was not being pulled over was clearly false, because plaintiff had only pulled over after John Doe had stepped into the middle of plaintiff's lane of traffic on the public street and flagged plaintiff into the parking lot, all while lights were flashing on the police car parked at the location.  Decl. ¶ 11.  Defendant Jane Doe stated that the purpose of the stop was a survey of drivers' behavior and that she wanted to take a cheek swab to check for the presence of prescription drugs.  *Id*.  She also stated that plaintiff would be paid if plaintiff agreed to the same.  Decl. ¶ 132.  Plaintiff refused to provide the cheek swab she requested. Decl. ¶ 13.

Jane Doe then tried a second time to convince plaintiff into providing a cheek swab. Decl. ¶ 14.  Plaintiff again refused to provide a swab.  Decl. ¶ 15.

Undaunted, Jane Doe then tried a third time to coerce plaintiff into giving a cheek swab. Decl. ¶ 16.

At this point plaintiff stated to her very firmly, "No.  Thank.  You."  Decl. ¶ 17.  Jane Doe then tried to hand plaintiff a pamphlet, which plaintiff did not accept.  Decl. ¶ 18.  Jane Doe then walked away from plaintiff's car.  Decl. ¶ 19.

Plaintiff then tried to exit the parking lot but found no means of egress.  Decl. ¶ 20. Other cars had by then also apparently been pulled off the road.  *Id*.  Several feet away in the parking lot a City of Reading police officer was sitting in his police car, and he pointed toward the entrance to the parking lot through which plaintiff had entered as though plaintiff should exit that way.  Decl. ¶ 21.  Plaintiff then left the parking lot.  Decl. ¶ 22.

Plaintiff believes that John Doe and Jane Doe were acting as employees or authorized agents of PIRE, and that PIRE receives money from the federal government to research the driving habits of motorists.  Decl. ¶ 23, 24.

It is plaintiff's understanding that PIRE contracted with the City of Reading and/or the Reading Police Department, with the approval and authorization Mayor Vaughn Spencer and/or Chief William Heim, and paid money to either or both of such entities to conspire to stop plaintiff and other motorists without probable cause or reasonable suspicion to believe that he, she or they had violated any law or provision of the Vehicle Code, and without satisfying the prerequisites for a legal sobriety checkpoint as mandated by the Constitution of the United States, the Constitution of the Commonwealth of Pennsylvania, and the laws of Pennsylvania. Decl. ¶ 25.

Plaintiff reasonably believed that he was under compulsion to stop his vehicle, to stay and interact with Jane Doe, that he was being detained, and that if he should try to leave he would be subject to arrest and prosecution.  Decl. ¶ 26.

## II.    Question Presented

Should Defendants City of Reading, Mayor Vaughn Spencer, Police Chief William Heim and the Pacific Institute for Research and Education Be Preliminarily Enjoined from Stopping Motorists on the Streets of Reading to Request a Cheek Swab Without a Warrant, Probable Cause, or Reasonable Suspicion to Believe that A Crime or Violation of the Vehicle Code has Been Committed?

Suggested Answer:    Yes.

### III.   Legal Argument

#### A.   The Fourth Amendment Prohibits Suspicionless Seizures Except in the Most Compelling Circumstances

The Fourth Amendment protects Americans against unreasonable searches and seizures by their government.[1]  It is "well established" that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment.  *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000); see also *U.S. v. Martinez-Fuentes*, 428 US. 542 (1976) ("It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment.").

"Suspicionless checkpoints" are subject to exacting scrutiny under the Fourth Amendment and will only be upheld in support of the gravest of law enforcement needs.

As stated by the Third Circuit,

> Suspicionless checkpoint searches are permissible under the Fourth Amendment only when a court finds a favorable balance between 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'

*United States v. Hartwell*, 436 F.3d 174, 178-179 (3d Cir. 2006) (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (in turn quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979))) (internal citations omitted) (footnote omitted).

The Supreme Court has expressly held that the Fourth Amendment prohibits suspicionless checkpoints established for the purpose of searching for drug offenders.  *City of*

---

[1]      The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

*Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) ("We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes . . . We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.").

If random stops for the purpose of attempting to determine drug use be repugnant to the Fourth Amendment, *a fortiori*, Reading's policy or arbitrary and capricious stopping of motorists and seeking samples of bodily fluid ("Stop-and-Swab Policy"), which is ostensibly for *conducting a survey* about drivers' habits, constitutes an unreasonable seizure.  Under Reading's Stop-and-Swab Policy, motorists are apparently not even stopped for the purpose of determining whether they are engaged in criminal activity, but rather *for the purpose of gleaning information about their long-term driving habits*.  If such a purpose can justify a suspicionless stop, one wonders what other survey subjects the City of Reading asserts are sufficiently compelling to justify the random stopping of vehicles.  Inquiries into Religious preferences?  Television viewing habits?  Sports team support?[2]

The Stop-and-Swab Policy is so repugnant to the Fourth Amendment as to be discredited on its very face.  How the Reading Defendants and PIRE ever could have thought that they were acting in compliance with the Constitution by establishing and implementing this kind of seizure

---

[2]     One can imagine the following:

Motorist: "Officer, why did you pull me over?"

Surveyor: "Oh, you're free to go.  But would you first mind telling me if you support the Eagles or the Steelers?"

Motorist: "You blocked my car and pulled me over with flashing lights on my way to work to ask me *what*?"

of innocent citizens is beyond comprehension.  This Court must now immediately halt this constitutionally-noxious practice so that plaintiff will not again be subjected to a stop for such a trivial purpose under threat of arrest for non-compliance.

The key inquiry in the present case is whether the suspicionless stops of motorists *for the purpose of research by a private company* is of such a compelling public need as to justify such stops.  The answer to this question is a loud "No."

### 1.      There is Little "Gravity" to the Concerns Asserted to Justify the Stops

The "gravity of the public concerns served by the seizure" come nowhere close to justifying warrantless, suspicionless stops of innocent citizens.  PIRE claims to have been conducting academic research.  It is research that could have been conducted any number of ways differently from subjecting motorists to a stop.  Phone interviews, in-person interviews, and medical testing of volunteers all could have satisfied PIRE's thirst for knowledge.  But even considering these alternative means of obtaining data, the question recurs: *What grave public concern is served by the seizure*?  Clearly: NOTHING.  PIRE is not even a *public* entity!  If there were such a "grav[e]" public concern to justify the physical stops of vehicles and requests for the check swabs, 1) the stops would not have been "voluntary" as defendants risibly claim, and 2) the government itself would have conducted the surveys and taken the swabs.  Law enforcement has no problem taking breath tests and blood samples even in the absence of a driver's consent and in the absence of a warrant when impaired driving is suspected.  But under Reading's Stop-and-Swab Policy, the police are working in concert with a private entity *to force* drivers to stop to ask them if they will *consent* to giving a DNA sample?  It's theater of the absurd.  There's no gravitas to the issue.

### 2.    There is Little Advancement of the Public Interest

Secondly, the degree to which the stop advances the public interest is so attenuated as to be minimal.  If cheek-swabbing of motorists who are not suspected of committing any crime be in the public interest, then so is cholesterol testing.  After all, a person could have a stroke while driving, of which elevated cholesterol might be a warning sign.  Similarly, motorists who drive while using air conditioning might be harming the ozone layer more than those who drive with their windows open.  Or vice versa.  Does the government really need to make suspicionless stops of motorists in their tracks to question them about their driving habits?  It's all absurdity.  There's no possible public interest that can justify the kind of stop to which plaintiff was subjected and will be subjected again in the future if the policy be not enjoined.

### 3.    The Interference With Personal Liberty Is Significant

Third, the severity of the interference with plaintiff is significant.  Plaintiff was stopped under a show of force.  Police lights were flashing.  Bright orange cones lined the lane where he drove.  A man stepped into traffic and physically blocked plaintiff from advancing in his lane. He was thrice subjected to pressure to yield a cheek swab.  Only because of strong personal resilience did plaintiff overcome what was, under any measure of the totality of the circumstances, a daunting and coercive atmosphere.  The police cruiser in the parking lot where plaintiff was directed contributed even further to the oppressive nature of the stop.

The government simply cannot act this way.  It is unconstitutional.

### B.    A Preliminary Injunction Is a Necessary Remedy

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the

public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)).

### 1.      Plaintiff is Likely to Succeed on the Merits

As has been shown, *supra*, precedent of the Supreme Court in *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000), and precedent of the Third Circuit in *United States v. Hartwell*, 436 F.3d 174, 178-179 (3d Cir. 2006), among others, condemn the Reading "Stop-and-Swab" policy.  There is not a single compelling governmental interest that justifies the intrusion on the freedom of drivers to justify the policy and its practice.  Nor is there any precedent to which defendants can credibly turn to justify its practice.

### 2.      Plaintiff Will Suffer Irreparable Harm if the Injunction Be Denied

The stop of an innocent citizen when he or she has done nothing wrong is a harm that cannot be compensated by monetary damages.  "When the police stop a motorist at a checkpoint . . . they intrude upon substantial expectations of privacy." *Maryland v. King*, 133 S. Ct. 1958, 1978 (2013).

Detention is significant impairment of one's ability to live freely that can never be restored once taken.  Being stopped under show of authority is a humiliating experience and one which interferes with daily life.  It is one that can subject the stopped motorist to the ridicule of passersby.  Now that plaintiff has courageously taken the step to challenge the Stop-and-Swab Policy in Court, what would prevent the police from deciding that they should stop him on the road to ask him "questions" about the reasons for his suit?  Under the City of Reading's apparent understanding of the Constitution, no suspicion of plaintiff's non-compliance with the law is needed!  There is no end to the possible justifications that could be raised by law enforcement officers if they be not enjoined from stopping innocent citizens for just any reason that they

choose.  The damage to the constitutionally-protected freedom from unreasonable seizures is irreparable.

### 3.    Granting the Preliminary Injunction Will Not Result in Greater Harm to the Nonmoving Party

No harm will befall the government if the policy be blocked from further enforcement. Indeed, the asserted need for the information being taken in the survey is for a *survey* being conducted by a *private company*, PIRE.  And the paradox of the whole matter is further revealed in the defendants' apparent insistence that any compliance with the survey is voluntary.  Yet voluntariness is no longer at issue after a motorist has been stopped *by show of authority*: orange cones, flashing police lights and a man physically blocking further driving with a direction to pull off the road.  If there be harm to the non-moving parties, they must explain how such harm can arise when they do not even attempt to seek warrants to obtain the information that they apparently assert is so critical to advance their law enforcement mission.

### 4.    The Public Interest Favors Such Relief

The Fourth Amendment's protection from unreasonable searches and seizures has been described as "of the very essence of constitutional liberty" the guaranty of which "is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen[.]" *Ker v. California*, 374 U.S. 23, 32-33 (1963) (quoting *Gouled v. United States*, 255 U.S. 298, 304 (1921)) (citing *Powell v. Alabama*, 287 U.S. 45, 65-68 (1932)).

In evaluating the public interest with respect to the systematic violation of the rights of motorists, this Court should consider the Supreme Court's pronouncement that the Fourth Amendment protects rights that are "of the very essence of constitutional liberty[.]" Accordingly, where such liberty is being systematically violated, it cannot but be in the public's interest that such violation be stopped.

10

**IV.      Conclusion**

We have not yet reached the level of police-state governing in the United States of America such that state actors are authorized to stop motorists for just any reason at all, no matter how inconsequential and distant from legitimate law enforcement their purposes may be. If Reading's "Stop-and-Swab" Policy be allowed to continue, the Fourth Amendment as the citizenry has known it from the founding of the Republic will be no more.

WHEREFORE, Plaintiff Ricardo Nieves respectfully prays this Honorable Court to PRELIMINARILY ENJOIN the City of Reading, Chief William Heim, Mayor Vaughn Spencer and the Pacific Institute for Research and Education from continuing to implement the "Stop-and-Swab" Policy.

Respectfully submitted,

**AARON MARTIN LEGAL, LLC**

/s/ Aaron D. Martin

By:      _____

Aaron D. Martin
PA Atty. I.D. No. 76441
Attorney for Plaintiff,
Ricardo Nieves
423 McFarlan Road, Suite 100
Longwood Corp. Center South
Kennett Square, PA  19348
(610) 444-2001
(610) 389-9634 (cell)
(610) 444-5819 (fax)
amartin@aaronmartinlegal.com

Date: December 24, 2013.

11